Department of Homeland Security, Mr. Panuccio. Thank you. May it please the Court, Jesse Panuccio for Appellant, Florida Division of Emergency Management. I'm reserving three minutes for rebuttal. As this Court found at the stay stage, the District Court erred in entering the preliminary injunction. I'd like to highlight three of the reasons in our brief, if I may. First, plaintiffs have no likelihood of success on the merits because venue was not proper and is not proper in the Southern District. If we had a more fact-bound inquiry, wouldn't we be just – wouldn't the cleanest way to resolve this appeal would be, if you're right, to address either or both of the no final action inquiry and the major federal control? You know, wouldn't that be the easiest? I think it's important to reach those, Your Honor, but I also think it's important to reach venue for a number of reasons. One, it may be that venue wasn't waived, and we could actually say that, but there's a lot to venue that could be sorted out, including claims that haven't even been addressed that it's not entirely clear to me, Mr. Panuccio. What would it matter? If we said there's no final agency action here and there's no federal control, what would venue really matter? A couple of answers to that, Your Honor. First of all, you know, we're at a preliminary injunction stage, so it would depend on how you say it. If you say there's no final agency action, there never can be, and this case is over, and you know, we direct the court to dismiss it, that might be one thing. If it's the preliminary injunction wasn't proper and we remand for further – Or it might be that we say there's no final agency action here for reasons A, B, and C, that we can't say how the litigation will unfold, but it could make it highly unlikely that those are ever going to really be satisfied. It couldn't, and if the court were to say something – But let's get – I mean, how about the second part, whether there's federal control here? I mean, this is, as I understand it, this is state property. Yes. It's owned by the state, controlled by the state. They built the facility. If they tomorrow want to use it for hurricane relief, they could decide to do so. Isn't that right? All of that is correct, Your Honor. I don't know how that's going to change. What would that mean in terms of the commitments as documented to the federal government with respect to how this property was supposed to be used, how it's being used, and the documents that show that the federal government intended to finance its use? Well, it depends which documents you're referring to, Your Honor. Are you referring to documents that were in the record at the preliminary injunction hearing? Yes. And I'm referring to the extensive factual findings from the district court in her 82-page opinion. Yeah, I think the most that can be said of the record, what is accurate of the record in the district court, and what every state and federal official attested to in declarations in the district court, is that the ultimate use of this property is Florida's. It is Florida's decision to accept or not accept any detainee. It is Florida's decision whether it can decommission this property and use it for something else. I don't believe there's anything in the record that can test that proposition. No, except you have a 287G agreement in which Florida has already committed to how it's going to use this property, and it's using that property in that way, and it's already taken pretty permanent steps. I think there's 800,000 acres, or however you want to measure it, that's already been paved, sanitation work has happened, there are human beings being housed there. So you're saying that Florida could decide one day that it just doesn't want to do that, and what happens to all that's happened already to that property? Well, absolutely. Of course, Florida and any other state or municipality that enters into a 287G agreement can back out of that agreement or can operate within the confines of that agreement to say we're not taking that particular alien or that particular detainee. And has Florida done that? Has it rescinded or withdrawn from that agreement? Florida has absolutely, under its discretion, under the 287G agreement and under state law and as a sovereign, the record is clear that Florida has refused to take entire classes of aliens at this facility. Florida will not accept women, Florida will not accept children at this facility, regardless of the federal government's request. So it's accepting men, it's accepting adults who fall within the class of undocumented persons who Florida has agreed to house. So what is the significance of the distinction in terms of the classes or population that you just identified? Well, I think it's an answer to your original question, Your Honor, which is does Florida retain state law authority under the 287G agreement, under this detention facility, to decommission it, to refuse to accept certain individuals or all individuals? And I think it's undisputed that the answer is yes. The federal government cannot... If the federal government doesn't control the property, I want to go back to the point where I don't think we finished. That's not going to really change, is it? That may not change, Your Honor, but if the court is going to remand the case in any way, I think it is very important. I want to get back to the beginning. It is very important to reach venue. There are many challenges that come up to this facility. At this point, they are all in the middle district. The suit's going to fail if there's no federal control, isn't it? Well... Aren't you better off to get a judgment in your favor on that ground? I think the court should reach both, Your Honor. I think the court should reach venue and it should also reach the jurisdictional problems with the case, and I think that's fully teed up for the court to reach in the briefing. And we would ask that the court, in fact, reach both. But I don't want to leave the impression that we think venue is important. I mean, I don't doubt that you'd like for us to reach every possible ground that you could win on.  Well, there... That's a different question. So if we were to say there was clearly, at the time of the preliminary injunction, no final agency action, and moreover, under DEPA, no federal control here, you've got to have both the funding and the control. There's no control. It's totally state property. That gives you a lot, doesn't it? It does. And if those are case dispositive, we would certainly welcome that. I would just say this. I just want... I'm trying to understand why at least the second wouldn't be. They've threatened other claims, like Clean Water Act claims and endangered species claims. There's nothing we can do on an appeal for preliminary injunction about threats of other kinds of claims. Yes. Here's what I think is important. The basic misapplication by the District Court of Jenkins-Brick and what is cognizable for venue is an important error to correct. And specifically with respect to this facility, because these are not... This case, even the threatened claims, are not the only challenges. If you look at the Pacer docket or the Westlaw docket... Okay. Well, you can decide to spend more of your time on the venue. I think with the limited time you have, I'm interested in the federal action. Now, is it all about money? Because there was... First, we're here on a preliminary injunction, so our standard is abuse of discretion. The District Court went through all of the testimony during the hearing as to the commitment from the federal government to fund this program. Is it just that once Florida gets the check that now we have federal action? Or what is this line? Because number one, our court has already said there's no litmus test for when the action goes across the line. And we're here on abuse of discretion. So are we just talking about a transfer of funds? No, I don't think so, Your Honor. And let me break this down in two different ways. So you can look at final federal agency action under the APA, and that's one important vector that the court needs to analyze. The other, of course, is under NEPA. There's a definition of major federal action, and as this State Panel concluded, that definition of major federal action here would require not only funding, but also federal control. You would have to have both for a non-federal action to qualify for NEPA. So even with funding under the major federal action definition, I don't think that would qualify because they haven't shown federal control. We just had a colloquy about that. This is still a state facility under state control. But even getting away from the NEPA framework, if you look to the APA framework, you know, in that 82-page opinion and in all the hundreds of pages of briefings we've had from appellees, it is very difficult to pin them down on what is the final federal agency action that grants the cause of action. They say it's a failure to produce or perform an EIS before the use of the property that is happening right now. That's how I understand it. Well, if that is, thank you, Your Honor. If that is what they are pointing to, just the failure to perform an EIS, the State Panel was clear about this, citing to the public citizen case out of the D.C. Circuit in 1992, the mere failure to perform an EIS itself is not final agency action. You have to channel that through some other action that would have triggered the obligation to perform the EIS. And that's the question. What is the other action they are identifying that says there, that's the federal final agency action? And then why isn't, and this is my last question for now, why isn't it, for those who care about the purpose behind NEPA, when would a state be required to engage in the environmental assessment before engaging in what appears to be pretty otherwise permanent activities on the property? I mean, it's hard to see where a state, as a state, would ever be required because it's federal procedural law, not state procedural law. And which is why I was going down the road. I was going down, Mr. Bonuccio. Yes, Your Honor. I see that I'm maybe into my rebuttal, so. Yeah, can I ask one question? So you start, I just want to, you started with three reasons. Yes. And you said venue. Yes. I just want to, what are the other two reasons? Okay, my third reason was the one we've been discussing, there's no final federal agency action. But the other one, and I think this is important, the district court blatantly misapplied Winter and the irreparable harm test. The irreparable harm test in Winter said you have to show it is likely and imminent. And I think this is important for the court to reach because what Winter says is, and what this court's cases say is, preliminary injunctions are supposed to be extraordinary. And we've moved to a world which almost every government action is met with a preliminary injunction. And the district court explicitly said, plaintiffs are not required to prove harms of a particular probability or quantity that is directly in the teeth of Winter. And it is important that that be corrected, that we do not have preliminary injunctions that are not based on the actual showings required by binding Supreme Court process. One more question, if I could, one more question about venue. So usually when venue comes up to us, it's just, you know, it's a motion to dismiss and the question was whether venue should be dismissed. Here it just seems like it's a little bit different. Is venue, are we being asked whether venue goes to likelihood of success on the merits? Is that the way we should analyze venue or should we analyze venue with whether it is or is not venue? Do you get my point? Like, is venue just likelihood of success or something separate? I do. And I understand the question. I think it's a good one. We raised it as, in our opening, in our supplement where we raised it, we said this is about like, the reason you don't have likelihood of success is you will not be able to show venue. We will have a forthcoming motion to dismiss. But I would say this, under the operation of the statute 28 U.S.C. 1406A, once a court determines that venue does not lie, the proper procedure is to dismiss or transfer. So if this court looks at Jenkins-Bricks, looks at the record and says venue is not proper here, I think the appropriate move would be at that point to order the transfer of the case to the district where all of these cases are proceeding, which is the middle district. Well, then one quick question. Unless you waive this, and why shouldn't we consider the one month delay that you raised this argument in the supplement to still constitute a waiver? Happy to address that, Your Honor, multiple reasons. First of all, that waiver is just not consistent with the plain text of the statute as the panel said. There are two circumstances under which you waive. If you don't raise it in the first response of pleading or you don't raise it in a 12B motion. Neither of which were filed. Neither of which were filed here. And the last thing I'll say about it is if you were to have some free form balancing test for waiver that was atextual from the rule, this would hardly be the case to apply it. We raised this issue in a supplement before there was any judicial action at all. Okay. Thank you, Mr. Panuccio. You saved three minutes. Thank you, Your Honor. Mr. Gustafson. Warning, Chief Judge Pryor, and it pleases the Court, Adam Gustafson for the Federal Appellants. We join the State's argument in full. Florida's decision to build a Florida detention facility in response to a Florida immigration emergency on Florida land does not trigger a Federal NEPA obligation. But the injunction irrevocably . . . We have a 287 agreement, right? If Florida next week saw that there were major hurricanes looming, would they have the right to convert this facility into a hurricane relief? Absolutely, Your Honor. The 287G agreement doesn't enslave the State to the Federal Government's priorities. The State is always . . . Any dispute in the record about that? No, there is not, Your Honor. Okay. So there's also no dispute. You're saying that States can now be in charge of immigration matters in our country? Because I understood that as being fully and solely within the domain of the Federal Government. So you're saying the Federal Government doesn't control that exclusively anymore? The Federal Government, under 287G agreements, can delegate certain responsibilities for immigration enforcement to the States, and the Federal Government has done this in a cooperative manner with States like Florida. But the State has to be willing to do it, right? Absolutely. And there are standards, federally set standards, that the States are expected to follow as well, or is it also once the Federal Government gives the States its authority, it's the Wild Wild West? No. Of course, there are Federal standards that the State has to comply with, and the Federal Government supervises the State's compliance with those standards. But at a facility like the one that we're talking about today, it is the State that is responsible for managing day-to-day operations, it's the States that's responsible for detention. Then why did the Federal Government, I believe not only the President, but also Noam, state it publicly? And the Feds will cover this. We will pay for it. We are committing, publicly and probably privately, that we will also fund this project. That's not right, Your Honor. The statements about anticipated Federal funding came from Florida. The Federal statements in the record are statements of cooperation, partnership, and those are the sorts of things that the District Court... So I'm sorry, just to be clear from the record, you're saying there was no statement from a Federal official committing to helping to finance, if not fully financing, this project? That's a different question than... Okay, what is the answer to that question? I would have to look at the record to refresh myself on exactly what was said about funding. There was no formal commitment to fund this project? Well, let's say once you refresh your recollection, my understanding is correct. Would that change your position in terms of the Federal action here? No, because final agency action is not dictated by press conferences, Facebook posts... Then that's not what I'm talking about. I'm saying that if there's something to support these public comments, is that enough for Federal action? The reason why I'm asking is similar to the question I asked your colleague on the same side is, are we really just talking about a transfer of funds? No, Your Honor. We're not just talking about a transfer of funds, but I'd point you to this Court's decision in South Florida Waste Water Management District, that Court makes clear that the even likely receipt of future money is not sufficient to satisfy the major Federal action requirement under NEPA. I do want to start... Well, that case again, as I mentioned earlier, also says there's no litmus test for Federal action, and we're here on an abuse of discretion after a pretty extensive factual record before the Court and as recited in the order. Well, that case came before the 2023 amendments to NEPA, which as Florida's counsel has pointed out, made clear that you need to show both Federal funding and... That without Federal funding or control, there is no major Federal action. I'd like to go back to venue where you ended with Florida. We urge the Court to reach this issue, and Chief Judge Pryor, in response to your question, it does make a great deal of difference what this Court does on venue. The plaintiffs have already indicated they intend to continue to litigate whatever funding does occur between FEMA and Florida, even if it's not related to this facility. If the preliminary injunction should not have been entered because there's no Federal control here, why would we breach venue? Well, Your Honor, that is one of the reasons that the PI should not have been ordered, but another reason... It's a reason that's not going to change, isn't it? Well, Your Honor, there are multiple cases... I mean, stop for a minute. As a matter of law, if that's true, their Federal case is over, isn't it? Your Honor, I anticipate, based on the course of litigation in this case, that we're going to continue to see challenges to FEMA... You're talking about other kinds of challenges? No. I mean, I'm talking about the complaint as framed now. If there's no Federal control, that's fatal to their claim, isn't it? It is fatal to their claim, Your Honor. Okay, and that's the only Federal claim here, right? That's right, Your Honor. Okay, and why would I want to talk about... And there are State claims here. Because venue is integrally related to the preliminary injunction. It was one of the reasons... There are lots of things that are integrally related to the Federal injunction, but there are all kinds of times where we vacate a preliminary injunction because there was no likelihood, substantial likelihood of success on the merits for at least a couple of reasons. We don't have to get into all of them. I mean, we don't have to, for example, notwithstanding what Mr. Pinocchio said he would like for us to do, get into the irreparable injury issue if it fails at the first step. No substantial likelihood of success on the merits. I agree with you, Your Honor, and this is a matter for the Court's discretion. Right. I mean, that's the way we usually exercise that discretion, isn't it? Well, no. I think the Court can exercise its discretion... No, no, no. That's the way we usually exercise that discretion, isn't it? I would defer to Your Honor on how things... You read our opinions about this. Well, I would point you to the Flowers case, which is cited in our brief. That's a P.I. order on appeal, and the Court didn't just dismiss the P.I., it reached the venue question. So this is certainly within the Court's discretion. I'm not saying we couldn't do it, but usually we take, if there are multiple defects, we take a couple of them and we're done with it, right? Your Honor, you have that option. I would just urge you to, in the interest of judicial economy... To do them all. To spend my time writing them all. I think it will ultimately save your time because there will be a slew of other appeals. There are many cases involving this facility that are already pending in the Middle District. It just does not make sense for the Clean Water Act and the Endangered Species Act and additional funding claims to continue to be litigated in the wrong forum. Can I ask you a question about the funding issue? Is there anything in the 287G agreement here that's different than, like, a 287G agreement with some other state or something like that? Your Honor, I haven't compared these agreements before. Yeah, I guess that's a really broad question. Are you aware of anything that you... I'm not aware of anything. And am I right that the funding, if there is some funding here, it's on, like, a per-detainee basis, something like that? Well, Your Honor, the record as it exists is the record as it was when the court issued the PI order. That's your upside foods case from last month. But, you know, as a matter of fact, I fully anticipate that any funding here would not be for construction, but would be, as you say, for the per diem expenses of housing detainees. And that is consistent with the documents that plaintiffs have tried to belatedly put into the record. If there are no further questions... No, you've saved... No, you didn't. All the rebuttal time goes to Mr. Panuccio. Let's hear from the other side. May it please the Court, Paul Schwepp for Friends of the Everglades and Center for Biological Diversity. Just to clear up a couple of matters that came up. In terms of the ability for the state to use this facility for anything other than immigration detention, the answer is no, it could not do that. And that's states... They couldn't do that? They could not, Your Honor. They couldn't move this facility to something else. Absolutely not. It was an airport before, right? Miami-Dade County owned the property, operated it as a training facility. So if tomorrow the Florida Department of Law Enforcement, FELA, wanted to start doing helicopter pilot training from there, they could do that, couldn't they? Yes, but here's what's different. This facility... So it can be used for a purpose, a different purpose? Yes, but here's what happened in this State's Exhibit 7. I thought you just said it couldn't. It cannot be used for an immigration detention, for anything other than an immigration detention. Well, you just said they could use it for helicopter training for the Florida Law Enforcement Agency. So here's what's different about this, Judge, and this is critically important. The state commandeered this property from the county which owned it, and they did so pursuant to a declaration of emergency, that's State's Exhibit 7, it's in the record, that allowed the Division of Emergency Management, which not surprisingly does not operate prisons, much less immigration detention facilities, allowed it to commandeer the property for purposes of assisting the federal government in immigration enforcement, and that emergency declaration allowed the division to enter into agreements, which has occurred, with the federal government to operate it as an immigration detention facility. Well, so if tomorrow they said, you know, the emergency's over and we want to relinquish it back to the county, because we're concerned that there's going to be an active hurricane season and we want hurricane relief efforts to be, the facility to be utilized for that, couldn't they do that? They could relinquish it, but that's not what happened here. Which means they have control over this. They have the control. They can use it as an immigration facility, they could use it for helicopter training, they could relinquish it to the county, they control it. Not quite, Judge, and here's why, and this is important, is they are operating this only as an immigration detention facility. They are doing that because they choose to. Well, what happens to the people? Let's say to the Chief's point, tomorrow Florida decides we don't want to use this facility anymore. We can use the runway, we can use the water, we can use the sewage, but what happens to the people? Who, and I hate to even use this phrase, who do the people belong to? The federal government, and Judge Williams found this. Every person at that facility is there for an immigration violation. And here, Judge Pryor, I think is what's different about this facility. They could stop taking those people there. The state could say, you know, we don't want to do that anymore, we don't want to detain any of those folks anymore. They could do that. So here's what major federal action means under NEPA, right? Substantial control and responsibility at a federal level. And here's what's different about this facility, and I would take the court to Arizona versus the United States, is constitutionally, under Article I, Section 8, immigration enforcement is exclusively, constitutionally, a federal function. The state has no role except as approved or authorized by the state. That's true at a constitutional level, and it's true under the INA, because Section 1231G gives the Secretary exclusive authority. Let's talk about this then. How is an injunction that bars the Secretary from detaining aliens at a place arranged by the Secretary not an injunction to restrain the operation of Section 1231? It's not because 1231G gives the Secretary authority to determine appropriate places of detention, but it doesn't, an exclusive authority. But this injunction, Your Honor, does not in any way impact that authority. What Judge Williams has, what she has ordered is that over time. You've got to, through attrition, we don't need to have any more aliens detained there. Isn't that right? No addition. Yes, but she hasn't, she hasn't in any way enjoined the Secretary. She's restrained the operation of Section 1231. The Secretary would like to place aliens at this place. She's entered an injunction that restrains the Secretary's power to do that. She has not restrained the Secretary's authority to determine an appropriate place of detention, and there's nothing in the statute that suggests that that authority doesn't have to be applied consistent with NEPA, which, by the way, is a mandatory statute, shall, if there's major federal action proposed that is subject to substantial federal control and responsibility. And substantial federal control and responsibility, and this is clear from your South Florida Water Management District case, doesn't mean absolute, doesn't have to be complete. The federal government does not have to be the primary actor. What this Court said in South Florida Water Management District is, if the, if the federal approval is a legal precondition to the action occurring, it's necessary for the action implementation then it is subject to federal control and responsibility, notwithstanding that state actors are involved. And this facility could not have opened as an immigration detention facility, which is exclusively under Arizona, a federal function, without a federal determination, a federal approval, and the federal government could shut it down tomorrow by pulling the 287G agreement. So, at the outset, it was approved by the federal government, and that is enough. That's true under Gilchrist, it's true under South Florida Water Management District, because the facility cannot operate without federal approval. There's not federal control when the state agencies retain their state law authority to make the decisions concerning the project. They want to convert it to the helicopter training or return it to the county tomorrow, they can do that. So they still retain the authority, the state law authority, to make those decisions, do they not? They do not have authority to operate an immigration detention facility. That's not the question I asked. That's not what I asked about. I'm reading from South Florida Water Management District at 1573. There's no federal control when the state agencies retain their state law authority to make the decisions concerning the project. If they want to stop detaining aliens there tomorrow and turn it into a helicopter training facility or relinquish it to the county, they can do that, can't they? And if they can, there's not federal control according to our decision. So Judge, they certainly could stop using it as an immigration detention facility, but they cannot operate it as an immigration detention facility, which is the critical issue here, without federal approval. That has to be, because it is what happens there affects international relations. That's what Arizona versus the United States tells you. Can I ask you this question? There's no federalism issue. This is a federal project exclusively, it must be. I may be confused about your, and maybe this is a question for the tribe, but your standing arises from the construction of the facility, right? That's the environmental harm, is the construction and use of the facility? Well, for Friends and Center Biological Diversity, there was testimony that their aesthetic and recreational interests would have been impacted. And then under Okilanta, because their procedural rights under NEPA, assuming NEPA is triggered, to participate in the NEPA process has been denied. So that's the redressability issue. And I guess that's where I'm, is there something specific about the use of the facility? You point out that the feds have to like decide themselves to use it as an immigration facility. Florida could have built it, I think. They could have built a building there just on their own, right? They don't need the federal approval for that. They couldn't have under the circumstances of this case because the Division of Emergency Management, again, they don't operate prisons, commandeered it under a declaration of emergency that was limited to dealing with immigration and authorized the division to enter into agreements with the federal government. Well, I guess, let's just assume a counterfactual where Florida declared that there was an immigration emergency and the federal government didn't think there was one, Florida could have done all the same stuff that it did. It could have taken the property, it could have built the immigration facility, it could have done everything that it did and the federal government just said, like, actually, we don't need that, right? Well, this wasn't a demonstration project. Can you clarify, in that scenario, could they also then house people under what otherwise is the federal government's immigration authority? In answering Judge Bradford's question. It would be, Division of Emergency Management does not operate prisons. I mean, that's the Department of Corrections, it's not a local jail. Is the answer to my question, yes, that they could have done that, but they could, I guess, that's what I'm trying to figure out. I think your answer to my question has to be, yes, they could have done all this, but to actually, to go to Judge Abudu's question, but to actually house the people, they need the federal government's involvement. Is that right? That is, that is right. This is not meant to be a trick question, I'm just trying to figure out what's going on here. Although, it sort of gets factually what occurred and the district court found this and the court's got to defer to her findings backwards, because what occurred here was that the department, the secretary, reached out to the state to say, we need more detention capacity. So it was initiated, it was requested by the department, and then in response to that, the Division of Emergency Management commandeered this property from Miami-Dade County for the exclusive purpose of opening an immigration detention facility, which then was approved by the federal government, and there, Chief Judge Pryor, is your final agency action. There was a decision by the federal government to approve this facility, which it had to do as an immigration detention facility, and that's the final agency action that is challenged in our case. Can I get you to address this hypothetical for me that's just been bothering me? So let's assume that the federal government says, look, there's a region of the country where we really need more Medicaid-eligible nursing homes. That's like a rural area. There's a lot of people that need nursing home care. And a state, or it could just be a private actor, says, okay, well, that's great. I will build one of those, and I will build it for the purposes of housing Medicaid-eligible nursing home residents. And is it going to be, you know, Medicaid's going to be involved in it. They're going to make sure that it's a valid facility to accept Medicaid nursing home residents. Is that a final agency action when that facility gets built? It would be final agency action at the point that the facility got built. So you would say that's a federal agency action, even if it was just like a private party that built the nursing home? But that's a separate question from major federal action under NEPA. And I think, you know, those things can tend to blur together, but they shouldn't. I mean, final agency action is what gives the court jurisdiction to pass on whether NEPA was triggered. And then NEPA asks the court to determine whether or not the action is subject to substantial federal control and responsibility. Again, the federal government doesn't have to be the primary actor. What I would say is different about our case than the Medicaid case that Your Honor was suggesting is here, and this distinguishes many of the cases on which the appellants are relying, the project is to serve an exclusively federal function. This facility would not exist but for immigration enforcement. The federal government has outsourced immigration detention to the state of Florida at this facility. That's what runs straight into 1252F1. I mean, because now you're just telling the Secretary, you can't approve this as a place for immigration detention. That runs straight into it. The Supreme Court has said it applies, that statute applies regardless of the claim. That's your problem. The statute does not obviate the requirement, which is mandatory in NEPA to comply with NEPA. A federal agency shall. It restrains federal courts from interfering with it. When the Secretary has decided on the place to detain immigrants, what this injunction is doing is restraining the operation of that, which the Supreme Court says, regardless of the claim, doesn't matter. So Texas v. Department of Homeland Security says even if the injunction may have some collateral effect on Part IV obligations. Well, Judge, respectfully, I believe it does. And here's why. The appellants have never come forward with any evidence that they can't achieve all their immigration enforcement objectives at other facilities. They haven't. But the very thing that the statutory authority provides is that the Secretary gets to decide the place. Yes, Judge. Our position is that the statute doesn't circumvent NEPA. In other words, the appropriate discretion includes application of NEPA. And if they didn't have individuals there, the state could do whatever it wants, as it's been doing, and the county with the property. As I view it, the issue is the fact that they've decided to assist the federal government in exercising its exclusive authority when it comes to the management of this population of individuals. So it makes me think the Chief's earlier question is that once a state decides it's going to do something that triggers federal law, it can always decide it doesn't want to do that. But once it does decide to do that, it has to comply with federal law. And I'm not hearing anything from either side that says that that is not the case. Absolutely, Judge. They would have to comply with NEPA. But the federal government has to comply with NEPA. You agree. Absolutely. The state, as the state, never has an obligation. If it's just operating as the state, NEPA just doesn't govern it, does it? NEPA does not apply to state assets. Yes. So what has to convert this is it has to be federally funded and federally controlled. And if there's no federal control, if the determination of this project is ultimately the state's decision, that's the real issue, right? Is there enough... Funding aside for a moment. You have to have both. And if there's not enough federal control over the project, you would admit if there's not enough federal control, NEPA doesn't apply, right? Here's what is different about this case, Chief Judge, is courts are constantly grappling with what is the level of federal control to trigger NEPA, substantial federal control responsibility. You said in South Florida Water Management District, if federal approval is a legal precondition to the implementation of the project, that's federal control, even if the state is doing it. What's odd about this case is most of those cases grappling with that distinction are road cases or Medicaid cases or storm, like in South Florida Water Management District, a stormwater treatment area or sewage treatment plant. That's the rattlesnake case on which the appellants rely. Those are intrinsically local functions. This is different. Immigration under Arizona versus the United States is exclusively a federal function because it can affect international relations. Considerably over, four minutes over. I think we understand the argument. I hope you'll be respectful of our time. Thank you so much, Your Honor. Good morning. May it please the court. Elliot Kula on behalf of the tribe. I want to take a step back because this idea that the state can cancel this project and reinvent it in another way is but one of the factual inquiries. The statute provides that where there's substantial control, where there's influence, those are inherently factual, just like there were the inherently factual issues with respect to venue and standing and final agency interaction. There's a precedent that controls us that says if the feds have influence, that's enough. You just said influence? Yes. What case says that? I'm sorry. If I said influence, that was a mistaken use of the word.  I understand the court is referring to the South Water Management case. That's an interesting case because that case arises out of a consent judgment, enforcement of a settlement agreement. So there were no factual issues in that case at all for the court to wrestle with. Here, we do have factual issues to wrestle with. We have an extensive 22 pages of recitations of fact on this issue alone, the final agency action and the major federal action. And so that's why I want to step back into that, quite frankly, comfort zone for me, where we're dealing with an abuse of discretion standard, where we're dealing with a highly deferential to the trial court's finding of fact following a four-day evidentiary hearing. And mind you, there were nine witnesses presented by the plaintiffs, one witness presented by the defendant. They didn't put on much of a case. So when you look at all these factual issues and you look at all these factual assertions and the trial court wrestling with these factual issues, we come back to that abuse of discretion standard. This is on a preliminary injunction. Respectfully, our position would be let's ground ourselves in that. Let's recognize the factual findings that were made, the factual evidence that were presented. There's no one singular fact that is dispositive here, even referring to the South Florida Water Management District case because, again, there were no factual issues in that case for the court to wrestle with. Here, there are extensive factual considerations to wrestle with. And candidly, no contravailing facts presented by either the federal or state defendant. The likelihood of success, of course, is one, and some would say perhaps a little more important than the other three factors, but you've also been criticized, your side, for not fully establishing irreparable harm here. So can you talk a little bit about why, even if you might have success at the end stage, the harm is irreparable? And I would refer the court to the factual findings in the order itself, and we're going to wrap ourselves in that order. And it begins on page 67 of the order, where the court enters a stage where it engages in about 15 fact findings, addressing, we'll put them in buckets. There's the gate harm. There's the lighting harm. There's the water pollution harm. The court goes through each of those and identifies the factual basis. It's a striking order. Every finding of fact in this order is followed. It's almost written like it's an appellate brief. Every finding of fact is cited to a witness testimony or an exhibit, and that goes to the venue issue. That goes to the final agency action, the major federal control, and the irreparable harm. So when we step back, you know, there was mention earlier on to the stay order that was entered, and I don't want to ignore that. It could potentially be a big pink elephant in the room. There is a panel in the court that looked at this and engaged in that analysis and came to a conclusion that there's no likelihood of success on the merits. There is the dissent in that opinion as well. And if we're going to look at that prior order to the extent it has any influential value to these proceedings, to this oral argument, I'd like to put forward Judge Jordan's dissent, which speaks to the extensive findings of facts, which speaks to the extensive deference that's due the trial court to the district court. Judge Jordan has an idiosyncratic view of that deference and how it works that has run headlong into a wall of our president. You know, things that he views as abuse of discretion or fact finding, we've said, in fact, are questions of law. So let's make sure that if you want to look to the influence of his opinion, we're not relying upon that idiosyncratic aspect of it. I fully appreciate and recognize that understanding of his dissent, but there is no debate here over the principles of law to be applied, and that's another thing that's striking in the brief. What's the debate here, what we are debating here this morning, the debate in the briefs has been how do these, everyone agrees on these principles of law, how are they applied to these underlying facts? And so there, idiosyncratic or not, we're still bound by the standard of review of deference to the trial court's findings of fact, the overarching abuse of discretion standard. It's striking to see an order that's this long, that has this many facts, that has this much dedication to the facts as to each element. On the venue, there's close to 20, 25, 26 statements of findings of fact, each again, like an appellate brief supported by a citation to testimony. And so I don't want to belabor it. I think there's been a lot of discussion already on these principal points, but I'd like to just be able to wrap my time up by urging the court to be adherent to these standards of review again, addressed by judge Jordan in his dissent, but not the idiosyncratic to use your word chief, not the idiosyncratic portion of his. I mean, you recognize there's the portion that we've rejected. I understand that completely, but I'm just talking about the insistence that there be adherence to the standard of review. The ones that are not so debatable, the ones that involve deference to the trial courts, finding a fact, having heard nine witnesses by the plaintiff side, one witness by the defense side, hundreds of exhibits over the course of four days. And then having entered into 82 page, finding a fact again, written in the nature of an appellate brief with a citation to. The question is not whether we have a debate about what the law is in the standard underneath, but it's about whether or not the facts and the records support the district court's conclusion. And under an abuse of discretion standard and as detailed as these facts were, it seems that we should err on the side and I don't think it's necessarily judge Jordan's idiosyncratic thoughts about the law. It's about the facts. That's correct. And I think I'm going to leave it there because that was about the best restatement of the position as one could imagine. Respectfully, we asked the court to affirm the final judgment for the trial court, the district court, the, the, the, I'm sorry, I didn't mean final judgment too many oral arguments in the same week. Affirm the preliminary injunction based on an application of the well established standard, giving deference to the to the district court and allowing the proceedings to move forward. Thank you. I'm going to try to make a few quick points on rebuttal. If I may, I'd like to start off where Mr. Kula left off the standard overview. The standard overview on a preliminary injunction is, is, is abuse of discretion, but that means to know, but for questions of law, clear error for questions of fact, there are many legal errors in the potential likelihood of success on the merits. We've said time and again, questionable, right? But there are men. And just to, to, to further that, there are many legal questions raised in our briefs. Does Jenkins brick permit review of the, of the effects of defendants actions are state actions cognizable under the APA and NEPA do various statutes, remove federal detention decision from review on this case and on and on. Those are legal questions. Those are legal errors. They are reviewed DeNovo does the federal government then still have over this population or none? Well, if you're asking your honor about the detention decision, which the lower federal court is stripped from enjoining as chief judge prior pointed out, yes, ultimately whether the person is detained generally somewhere in the country is the decision of the federal government. Federal law makes it very clear. We can't restrain that through an injunction. Exceptionally clear. And if the decision they are pointing to as the final agency action is the decision to detain here, the, the state's allowance of it, NEPA doesn't apply to that. Just to go to the point that was already made the, the ACA opinion that came out one 61 F fourth seven 65 at seven 91 judge Newsom said judge Jordan's idiosyncratic view on how this court reviews preliminary injunctions has is, is foreclosed by wall of precedent. That is the precedent of this court. But I want to point out the ACA case for another issue, your honor. And I just want to go back to venue. It really will depend on what this court says about the merits of the NEPA claim as to whether this can go back down in the ACA case. Judge Newsom said, of course we are not deciding. Although, although we are saying that Ford is not entitled to preliminary injunction. We're not deciding that for all time in the case, the merits can be litigated again. So the court would need to affirmatively say we are deciding the merits here and there is nothing left. No judicial labor left in the Southern district of Florida. If that is not claims here, right? Aren't there state law claims here? They have some state law claims. That's not anything we can do anything about, right? Including venue has to them, right? Right. I mean, I, I, well, I, I think it's a question of what gets left. If there's anything left to the NEPA claim, they will litigate it. We'll be, there'll be a lot of judicial and party labor, and then we will be back up here. Another rebuttal point I want to make your honors is about use of the facility. There was a lot of questions. I believe what Mr. Schwepp was referring to is the emergency declaration for this use. Okay. Fair enough. But even the municipal use as an airport flows from state law, right? Municipal you miss miss one. These in Florida don't exist on their own. They exist as a function of state law. And beyond that, even under the governor's emergency powers, the governor could declare a hurricane emergency this June and say, convert that to a staging facility or for a facility to handle displaced persons from the East or West coast and a hurricane. And that would be something the state could do. And the federal government would have no say whatsoever. But they would have a say where those individuals who've been detained are supposed to go. Correct. Well, of course they would, that would be the detention decision, which is stripped from district courts. Thank you. Okay. Thank you, Mr. Canuccio. We have the case we're going to move on.